## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

DAVID SCHWARTZ,

     Plaintiff,

                                CASE NO.  2:21-cv-283-SPC-MRM

     v.

ADP, INC, formerly known as ADP, LLC, and
AUTOMATIC DATA PROCESSING, INC.

     Defendants.

_____/

## THIRD AMENDED VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

     Plaintiff, DAVID SCHWARTZ, by and through undersigned counsel, by way of Third Amended Verified Complaint for Injunctive and Other Relief against the Defendants, ADP, INC. and Automatic Data Processing, Inc. and states as follows:

## I.       PARTIES, VENUE, JURISDICTION

1.     Plaintiff, DAVID SCHWARTZ (hereinafter "SCHWARTZ"), is a resident of Lee County, Florida and is therefore within the jurisdiction of this Court.

2.     Defendant, ADP, INC. is a Delaware corporation with its principal place of business located in Roseland, New Jersey. ADP, INC. operates and conducts

business in Florida, maintains significant contacts in Florida, and all actions giving rise to this cause of action occurred in Lee County, Florida, from which this Court has jurisdiction.

3.      Defendant, Automatic Data Processing, Inc., is a Delaware corporation with its principal place of business located in Roseland, New Jersey. Automatic Data Processing, Inc.  operates and conducts business in Florida, maintains significant contacts in Florida, and all actions giving rise to this cause of action occurred in Lee County, Florida, from which this Court has jurisdiction. Automatic Data Processing, Inc. is the ultimate parent of ADP, INC.

4.      Automatic Data Processing, Inc. and ADP, INC. are referred to collectively herein as "ADP".

5.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*, the Stored Communications Act, 18 U.S.C. § 2701, the Wiretap Act 18 U.S.C. 2510 *et seq.* and 18 U.S.C. § 2520 *et seq.* and the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Consolidated Omnibus Budget Reconciliations Act of 1985 ("COBRA").

6.      This Court has supplemental jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1367(a) as the claims relating to violations of Fla. Stat. § 934 *et seq.*,

Florida's Security of Communications Law, and violations of Fla. Stat. § 501 *et. seq.*, Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") which are so related to the federal claims in this action that they form part of the same case or controversy.

7.     This Court also has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332 because the Plaintiff is a citizen of Florida. Defendant, ADP, INC. is incorporated under the laws of the State of Delaware with its principal place of business in New Jersey.   Defendant, Automatic Data Processing, Inc., is incorporated under the laws of the State of Delaware with its principal place of business in New Jersey. For diversity of jurisdiction purposes, Defendants ADP, INC. and Automatic Data Processing, Inc. are citizens of Delaware and New Jersey.   Further, the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in Florida in this District and Plaintiff suffered injuries as a result thereof in this District

9.     All conditions precedent to the maintenance of this action have occurred, have been performed, or have otherwise been waived or excused by Defendants.

## II.        HISTORICAL AND FACTUAL BACKGROUND

10.     The following historical and factual background is provided to support the motive and malicious actions that precipitated the alleged counts below.

**A. ADP's Bad Acts and Continuous Retaliation and Persecution of Schwartz**

11.     ADP is a large, publicly traded company and in 2020, was ranked at 227 on the Fortune 500 list of United States corporations by revenue.

12.     As such, ADP is a registrant with the U.S. Securities and Exchange Commission ("SEC") and must comply with rules, regulations, reporting requirements and internal controls promulgated by the SEC and the Sarbanes-Oxley Act of 2002 (SOX).

13.     In or around May 2015, ADP hired Schwartz as an Associate District Manager.

14.     Due to his high level of performance, in March 2016 Schwartz was promoted to District Manager in Plaintiff's Small Business Services division.

15.     Schwartz continued to out-perform his peers and just a year later was again promoted to Senior District Manager Elite Performer in July 2017.

16.     From early in his employment, Schwartz began to question certain business activities, practices and policies of ADP that Schwartz believed were in violation of federal, state and/or local laws, rules and/or regulations, including, but not limited to, the following:

(a) <u>State Unemployment Insurance ("SUI")  Application  and State Income Tax ("SIT") Fraud</u>:

<u>i.</u>  ADP Fraudulently procures and signs their customers' State Unemployment Insurance Account and State Income Tax Account applications.

<u>ii.</u> ADP Small Business Services Payroll sales representatives must turn in completed SUI and SIT applications, or verification of application completion, to ADP's internal implementation team which processes all of ADP's new client orders.

<u>iii.</u>      ADP's Small Business Services Payroll sales representatives are trained, incentivized and pressured to submit these materials as quickly as possible so that they can "hit" their sales quotas so that they, and ADP's management, can earn the commissions associated with establishing the new client account.

<u>iv</u>.      The SUI and SIT applications are regularly signed by ADP Small Business Services Payroll sales representatives as if they were the client, many (if not all) times without the client's authorization, knowledge or consent.

v. This oftentimes results in ADP's Small Busines Services Payroll clients receiving unexpected tax notices from various states regarding unemployment tax and income tax reporting and submissions, along with assessed penalties and fees against the clients of ADP, who often were wholly unaware that ADP had forged their names to a state document warning of the reporting requirement and the potential for civil and *criminal* penalties for failing to file and submit required periodic reports and taxes.

(b) Unlicensed/Unethical sale of Securities through Savings Incentive Match Plan for Employers Individual Retirement Accounts ("SIMPLE IRAs"):

i. ADP's Small Business Services Payroll sales representatives are trained, incentivized and pressured to sell securities from American Century Investments using SIMPLE IRAs to their clientele, including to owners of one- and two-employee companies (even in instances when a "SEP" IRA or 401K would be more suitable) and are sometimes punished when they do not sell their quota of SIMPLE IRAs.

ii. ADP trains and incentivized its Small Business Services Payroll sales representatives (almost all of which are unlicensed in connection with the sale of retirement benefits/securities) to sell and/or convince clients to purchase SIMPLE IRAs tied to securities/investments, over SEP IRAs and 401Ks.

iii.       because ADP makes significantly more money from the sale of SIMPLE IRAs, SIMPLE IRAs are pushed and sold by the unlicensed sales associates, even when not in the best interests of ADP's clients.

iv.       To explain how ADP puts profits over clients, with SEP IRAs the ADP client generally does not make its contributions until year end, whereas with SIMPLE IRAs, the ADP clients and participants are making contributions each payroll period, allowing ADP to hold billions of dollars throughout the year and generate compounded interest on the money while they hold it.

v. As incentive, ADP sales reps receive $1,200 per SIMPLE IRA sold (as opposed to $600 per SEP IRA sold), receive prizes through internal contests and receive further recognition and encouragement by their superiors. Further, if a sales associate underperforms, they are called out in front of their peers.

(c) <u>Falsifying social security numbers</u>:

i.      When ADP signs a new payroll client, ADP assumes full-level tax liability for the client and therefore sends out IRS Form W-2s to all of the clients' employees at the end of the year.

ii.     If a social security number is not accurately entered (or falsely entered), an employee's earnings and taxes will be associated with someone other than the proper employee/taxpayer.

iii.    However, ADP's sales employees are trained, incentivized and pressured to submit the names and social security number information as quickly as possible, and are often told to "come up with a number" or "go find one" when the actual employee social security numbers are not available, or are "masked", so that they, and management at ADP, hit their sales quotas/targets and earn the commissions and bonuses associated therewith.

iv.     Thus, as a way of expediting the process (with ADP management's full knowledge and support) the ADP Small Business Services Payroll sales representatives "plug in" random social security numbers in order to get the client "up

and running" and then will amend the forms after the fact, in some cases. ADP personnel sometimes refer to these falsified social security as "Placeholders" or "Dummy SSNs".

17.    Schwartz began voicing his concerns to his direct supervisor, Milina Corrochano, and her Vice-President Javier Falla, on or around June 7, 2018, from which he explained that he felt pressured by ADP to manipulate and persuade ADP clients to run payroll when the client had no wages to report.

18.    Schwartz's concerns to Ms. Corrochano and Mr. Falla fell on deaf ears and, in fact, Milina Corrochano texted Schwartz, only moments after he voiced his concerns, pressuring him to further engage in the questioned conduct.

19.    Schwartz sent numerous emails to ADP's management, Associate Relations (HR) and ADP's Legal Counsel on or about June 7, June 14, June 19 and June 20 of 2018 expressing his concerns over the illegality of ADP's improper business practices.

20.    Schwartz also reported his concerns to ADP's "ethics helpline", and personally discussed these important issues with Christiane Roman (Associate Relations Manager), Juanita Hanley (ADP Broker Dealer & Strategic Services Chief Compliance Officer), James Goldrick and Gregory Kohles (Lead Investigative Security Agents for ADP's Global Security Operations ((GSO)) team).

9

21.   Rather than cure the illegality of its business activities, practices and policies, ADP simply ignored Schwartz's objections and turned the proverbial blind eye to ADP's illegal and fraudulent conduct.

22.   To make matters worse, upon receiving Schwartz's complaints, ADP affirmatively retaliated against Schwartz by locking him out of his computer, iPad and mobile phone emails in retaliation for voicing his concerns.

23.   Consequently, on June 17, 2018, Schwartz sent an email to Christiane Roman stating that he had been locked out of his ADP-issued laptop and iPad, that he could not access his ADP email and client contacts.  Schwartz also indicated that he filed a complaint with the U.S.  Securities and Exchange Commission (SEC), as well as the Financial Industry Regulatory Authority (FINRA), and that he had a call scheduled with the SEC the next day.

24.   Additionally, in the same email, Schwartz requested that his access be restored immediately so that he could perform his job duties and so he could provide FINRA with information they were seeking.

25.   Not surprisingly, Schwartz's complaints to ADP's management regarding the illegality of ADP's business practices continued to fall on deaf ears.

26.   Thus, in a further effort to bring ADP's misconduct to light, sometime around early to mid-June, 2018, Schwartz submitted a detailed complaint to the SEC and FINRA indicating that Schwartz had been employed by ADP more than

3 years and advised that he was one of ADP's highest performing sellers of IRAs and actually trained other unlicensed/unregistered ADP employees on how to sell IRAs for ADP, including appearing in ADP training videos. *("SEC Complaint"- See attached Exhibit "A")*

27.     Rather than substantively respond to Schwartz's well-founded concerns over the illegality of ADP's business practices, on June 19, 2018, ADP sent Schwartz a letter which acknowledged receiving Schwartz's concerns, acknowledged the SEC Complaint, and attempted to intimidate and threaten Schwartz in hopes that Schwartz would discontinue his lawful reporting regarding ADP's actions. *("June 19th Letter"- See attached Exhibit "B")*

28.     After the multiple attempts by Schwartz to rectify the situation and after ADP knew that Schwartz had provided the SEC and FINRA with a complaint, on July 3, 2018, ADP Divisional Vice-President Stephanie Karasiak emailed ADP Vice- President of Human Resources Manager Alexandra Brunetti, essentially asking when ADP was going to get rid of Schwartz and further complained that "it has been over 3 weeks with no resolution".

29.     Rather than working towards resolving Schwartz's well-founded concerns concerning the illegality of ADP's unlawful business practices, on or about July 18, 2018, ADP retaliated against Schwartz by wrongfully terminating his employment before Schwartz's stock in ADP and other benefits could vest.

30.   Since his employment with ADP was terminated, Schwartz has been unable to find substantially equivalent employment.

**B.  ADP's Bad Acts are Corroborated by Others**

31.   Since being wrongfully terminated by ADP, Schwartz has received information from multiple third parties that further corroborate Schwartz's concerns regarding ADP's business practices, including many former employees and executives of ADP.

32.   Many of the third parties expressed the same or similar concerns regarding the illegality of ADP's business practices. For example:

(a) Schwartz received copies of various letters sent by Trust Administrators, Inc. to the U.S. Securities and Exchange Commission that discuss and highlight ADPs illegal sales activities *("Trust Administrators Letters"- See attached "Exhibit C")*

(b) In May 2019, Schwartz received the following message from a "former ADP SBS District Manager": "I applaud you for the stance you are taking. I saw the same garbage behind the scenes and had to get out of there as it made me sick to my stomach. Well done sir, be a pleasure to connect with you on Linkedin."

(c) In May 2019, Schwartz received the following message from a former employee of ADP: "I saw your article and can attest to everything mentioned. I used to work for ADP and ran into the same things. It's absolutely crazy what went on over there .... "

(d) In May 2019, Schwartz received the following message from "a former ADP executive": "As a former ADP executive, I had countless clients who suffered from preventable tax issues that caused liens, penalties, and irreparable harm to their credit reputation as a company. Even as the regional executive, there was very little I could do as the internal operations simply were not setup efficiently to prevent issues from occurring and from resolving them expeditiously when they happened. While I can't speak to the sales side or the claims of fraudulent records being produced, I know for a fact that the mishandling of tax issues that did bubble up, were the number one reasons clients left. If this class action is truly in motion, I really hope that these clients get the resolution they deserve and that ADP takes extreme measures to get these operational issues fixed."

(e) In May 2019, Schwartz received the following message from a former employee of ADP: "I was an employee at ADP from 2015-2018. This story rings true to me as well, as I was fired for the same

reasons as Mr. Schwartz. I was the recipient of multiple incentive trips and was coaxed by management to do the same things that Mr. Schwartz describes. I knew what I was doing was wrong, but the pressure essentially got to me. The guilt lives with me this day. I am happy to provide whatever information I can to help support this claim."

(f)   In May 2019, Schwartz received the following message: "In my 10 years I have worked with many former ADP reps that have full on admitted they did it. The reason you wouldn't know is they are going on the state Department of Revenue website and filling out the actual application for their unemployment account number using the employer's name, legal address and FEIN number. Why this is fraud is they are answering business operating questions on behalf of the business owner without actually knowing the correct information. They will electronically sign it on behalf of the employer using their name as well ... once again making it fraud. This would then assign a unemployment account number to the entity so they could turn in a complete load and get revenue credit. The other issue is they are entering the ADP tax department as the mailing address, so the employer never gets notice of a penalty that creates major issues for the employer ...."

(g)     In May 2019, a former phone support administrator for ADP advised Schwartz in writing that while providing phone support for ADP she learned of instances where false social security numbers had been inputted into SUI apps, and stated "I reported it to my manager and asked if I needed to send it to legal but nothing happened."

C. **ADP Attempts to Silence Schwartz and Others**

33.   In further retaliation and in an effort to silence and discredit Schwartz, shortly after Schwartz was wrongfully terminated, on November 8, 2018, ADP availed themselves to the jurisdiction of Florida and sued Schwartz in the 20th Judicial Circuit of Florida, Lee County Case No. 2018-CA 005454 ("the 2018 Case") alleging, among other things, Breach of Contract and Misappropriation of Trade Secrets.

34.   On March 29, 2019, Schwartz filed his Answer, Affirmative Defenses and Counterclaim for wrongful termination under Florida's Whistleblower Protection Act.

35.   In further effort to silence Schwartz calling out ADP's illegal business practices, on June 4, 2019, ADP further availed themselves to the jurisdiction of Florida and filed a second lawsuit against Schwartz in the 20th Judicial Circuit of Florida, Lee County Case. No. 2019-CA-003479 ("the 2019 Case"), alleging defamation and is seeking a record-breaking Three Hundred and Sixty Million

Dollar ($360,000,000.00) judgement from Schwartz, even though they have yet to show a single dollar in damages.

36. Both of the aforementioned cases are still pending.

37. Subsequent to the filing of the aforementioned lawsuits by ADP, in or around September 2019, during a two-day meeting which was led by ADP Divisional Vice-President Stephanie Karasiak and which was attended by all ADP Florida vice-presidents in Orlando, Florida, Schwartz's name was mentioned by an attendee. In response, Stephanie Karasiak emphatically proclaimed to all attendees that Schwartz "is a cancer" and further warned attendees not to speak to Schwartz if they wished to remain employed by ADP.

38. Much to ADP's chagrin, Schwartz was not intimidated and continued to defend himself against ADP and retained undersigned counsel.

39. Knowing that Schwartz's concerns were not meritless or baseless and that Schwartz had been in contact with the SEC and FINRA, ADP began a campaign of illegal access and monitoring Schwartz's Apple accounts, Apple ID's, Apple iCloud, Apple device applications and Apple iPhones as described in more detail below.

D. **ADP's Culture of Encouraging Unethical and Illegal Practices is Exposed**

40. On February 21, 2020, Counsel for ADP deposed Schwartz. Schwartz outlined the culture at ADP and disclosed the following:

(a)  ADP has a culture of shaming its unlicensed/unregistered Small Business Services Payroll sales representatives who fail to sell enough SIMPLE IRA plans to meet the quota set by their bosses are shamed and humiliated in front of their fellow employees and ADP managers.  Such shaming and humiliation include forcing said ADP Small Business Services Payroll sales representatives to stand up in front of a large group of fellow ADP employees and ADP managers and sing a rap song.  ADP CEO Carlos Rodriquez not only personally witnessed these humiliating acts, but actually participated, as can be seen in the video. (**SEE VIDEO LINK [https://youtu.be/3PQDYi2Iy90](https://youtu.be/3PQDYi2Iy90) )**

(b)  ADP has a discriminatory culture relating to African American clients.

(c)  Schwartz went on to describe how ADP regularly posted photos with the superimposed faces of its unlicensed/unregistered employees after the sale of a SIMPLE IRA. These posts show the superimposed faces of ADP employees knocking out African Americans after they were sold a SIMPLE IRA, while other African Americans who purchased SIMPLEs had their pictures posted with their salesperson holding a sign that said, "That was simple."  **(See attached "Exhibit D")**

17

41.     Rather than ask Schwartz more questions about the allegations of racism and racist actions in the Detroit area ADP office, Counsel for ADP abruptly stopped the deposition and stepped out of the room to make a phone call.  When the deposition resumed, instead of asking further questions about the alleged racism and racist actions of ADP, Counsel for ADP began a different line of questioning, presumably to avoid having a record of sworn testimony regarding ADP's racist practices. (*"**Deposition Transcript Excerpt**"- See attached "Exhibit E"*)

42.     ADP, INC. managers regularly post pictures and memes showing "cash in hand" and other celebratory memes relating to the sale of securities through SIMPLE IRAs by their subordinates, despite the fact that their subordinates are almost never licensed or registered to sell securities through SIMPLE IRAs.  *(See attached "Exhibit F")*

43.     ADP regularly uses the likeness of its employees by superimposing their photographs into "Face in the Hole" graphics and other graphics without the permission or consent of said employees and without compensation for same. **(***See attached "Exhibit G"***)**

44.     Small Business Services Payroll sales representatives advise ADP clients to unlawfully misclassify certain employees as 1099 (independent contractors) and hold or destroy the checks generated by ADP when ADP clients did not actually

owe any monies to independent contractors so that ADP Small Business Services Payroll sales representatives, and ADP management could "hit the numbers".

45.    Another former ADP Small Business Services Payroll sales representative from ADP's Fort Lauderdale, Florida office provided sworn video testimony that corroborated the same practices Schwartz complained of and which led to Schwartz's wrongful termination.

46.    Specifically, the former ADP Fort Lauderdale Small Business Services Payroll sales representative provided testimony in intricate detail and described how he was instructed to forge ADP customers names to Florida Department of Revenue Form DR-1 (State Unemployment Insurance Account Number Applications, also known as "SUI Apps"), and how he was instructed to do so by his direct report at ADP, Michael Slattery.

47.    Additionally, the former ADP Fort Lauderdale Small Business Services Payroll sales representative provided testimony relating to the page-by-page written instructions/power point presentation ADP provided to its payroll sales representatives, which included step-by-step instructions on how to complete the SUI app *and sign ADP's customers' names, all without the knowledge and consent of ADP's customers.* **(*See attached "Exhibit H"*)**

48.    The former testimony is corroborated by emails and text messages between another former ADP Small Business Services Payroll sales representative from

the ADP West Palm Beach office and an ADP Small Business Services Payroll services client. *(See attached "Exhibit I")*

49.  The former ADP West Palm Beach Small Business Services Payroll sales representative's text messages and emails clearly indicate that ADP unlawfully applied for a SUI number with the State of Florida and the State of Georgia, presumably acting as if the ADP employee was the owner of the ADP client's business. *("Texts and Emails"- See attached "Exhibit I")*

50.  Additionally, the former ADP West Palm Beach Small Business Services Payroll sales representative's text and emails clearly show the former ADP West Palm Beach Small Business Services Payroll sales representative suggesting the client illegally misclassify an employee as an independent contractor ("1099") so that ADP could run the payroll without having to apply/wait for an account number from the State of Georgia for the submission of Georgia income tax. *("Texts"-See attached "Exhibit J")*

51.  The former ADP West Palm Beach Small Business Services Payroll sales representative/ ADP entered the former ADP West Palm Beach Small Business Services Payroll sales representative's ADP-issued mobile phone number in the State of Georgia's Department of Revenue and Department of Labor website applications as part of the fraudulent application submissions submitted to the State of Georgia.

52.    In addition to describing how ADP Payroll Small Business Services Payroll sales representatives were instructed to forge ADP's customers names as described above, the former ADP Fort Lauderdale Small Business Services Payroll sales representative  provided testimony describing how ADP Payroll Small Business Services sales representatives were required to sell SIMPLE IRAs (tied to securities) to ADP's customers despite the fact that ADP, INC. (the ADP entity that employs ADP Small Business Services Payroll sales representatives) is not licensed or registered with the Financial Industry Regulatory Authority ("FINRA") to sell securities, and despite the fact that ADP Small Business Services Payroll sales representatives generally are not licensed to sell securities and are not qualified to offer tax advice.

53.    The former ADP Fort Lauderdale Small Business Services Payroll sales representative described, in intricate detail, how unregistered/unlicensed ADP Small Business Services Payroll sales representatives were instructed to use the ADP SIMPLE IRA/Retirement Calculator to discuss plan costs, tax savings, using aggressive projected returns based on aggressive rates of return, and specifically did not discuss risk or disclose that the customer could lose money on their investment. *("Calculator Screen Shots"- See attached "Exhibit K")*


54.    The former ADP Fort Lauderdale Small Business Services Payroll sales representative further described how after the ADP Payroll customer agreed to

purchase the SIMPLE IRA, the customer was then connected by telephone to an ADP Broker-Dealer employee to "finalize" the sale of the SIMPLE IRA.

55.   The former ADP Fort Lauderdale Small Business Services Payroll sales representative further testified that no prospectus was provided at the first meeting with the prospective SIMPLE IRA purchaser and that ADP Small Business Services Payroll sales representatives were instructed not to show the customer the ADP SIMPLE/RETIREMENT Calculator.

56.   Additionally, the former ADP Fort Lauderdale Small Business Services Payroll sales representative provided detailed testimony as to how the unlicensed/unregistered employees were paid for each SIMPLE IRA sold, and further described under-the-table cash payments and merchandise that was not included in their taxable income. *("Venmo Transactions"- See attached "Exhibit L")*

57.   The former ADP Fort Lauderdale Small Business Services Payroll sales representative also provided detailed testimony as to how the unlicensed/unregistered employees were provided with additional paid time off for selling SIMPLE IRAs.

58.   Additionally, ADP Small Business Services Payroll representatives who were not licensed or registered to sell securities regularly trained other

unlicensed/unregistered ADP Small Business Services Payroll representatives how to sell SIMPLE IRAs tied to securities. *(See attached "Exhibit M".*

59.    ADP's preferred investments/fund provider, American Century Investments, provided SIMPLE IRA/investment sales training to unlicensed/unregistered ADP Small Business Services Payroll sales representatives*. (See attached "Exhibit N")*

60.    ADP, INC. frequently holds national contests based on how many SIMPLE IRAs are sold by ADP, INC.'s unlicensed/unregistered Small Business Services Payroll representatives.  *("Contests"- See attached "Exhibit O")*

61.    ADP, INC. imposes mandatory SIMPLE IRA sales quotas on its unlicensed/unregistered Small Business Services Payroll sales representatives.

62.    Those who fail to meet their quotas are subjected to retaliatory action which includes requiring them to spend additional hours in an ADP office where they receive additional training on the sale of SIMPLE IRAs and are forced to "cold call"/sell SIMPLE IRAs.

63.    ADP, INC. employees instructed their subordinates how to manipulate the ADP Retirement Calculator to generate the desired ADP Retirement Calculator "recommendation" (most suitable retirement product) as: "SIMPLE IRA", as opposed to a SEP IRA, as ADP generates more income/profit from the sale of a SIMPLE IRA over a SEP.

64.   In fact, ADP and its managers only provided the aforementioned incentives and under-the-table-payments for the sale of SIMPLE IRAs (and not SEP IRAs), despite the fact that in many cases a SEP IRA would be the more suitable retirement investment vehicle, especially in the case of 1- or 2-person companies.

65.   ADP pressures its Small Business Services Payroll sales representatives to hit their targets and get new payroll accounts to process payroll "at all costs", as described in the former Small Business Services Payroll sales representative's testimony.

66.   ADP regularly uses high pressure tactics to coerce ADP clients into running (processing) payroll before the client is ready to, as well as in instances where the ADP client had no wages to report/pay. *(See attached "Exhibit P")*

67.   These tactics include threatening to withhold or even cancel ADP clients' workers compensation insurance policies that were sold to them by ADP.  *(See attached "Exhibit Q")*

68.   ADP instructed managers to hire only "the hottest females" they could find.


**IV.   <u>ADP'S UNLAWFUL ACTIONS AGAINST SCHWARTZ</u>**

69.    Despite the aforementioned retaliatory actions and lawsuits described in paragraphs 22 through 29 above, Schwartz fought back and provided evidence that supported his claims of ADP's illegal business practices.

70.    As ADP's litigation against Schwartz became publicized in the media along with all of the above cited actions by ADP, ADP became more aggressive and offensive.

71.    Around the time the Naples Daily News and Fort Myers News-Press reported on ADP's retaliatory lawsuits in late February/early March 2020, Schwartz noticed ADP had begun hacking into Schwartz's Apple accounts, Apple IDs, Apple iCloud, Apple device applications and Apple iPhones numerous times, gaining access to Schwartz's personal information and communications with his attorneys, as evidenced by documents provided to Schwartz by Apple showing that Schwartz's Apple accounts, Apple IDs, Apple iCloud and Apple device applications and Apple iPhone 6sm iPhone 7 and iPhone X had been hacked into, or accessed by ADP without authorization.  *(See attached "Composite Exhibit R" supplied to Plaintiff by Apple upon request by Plaintiff).*

72.    On or about November 20, 2020, undersigned counsel advised Counsel for ADP of ADP's unauthorized and illegal access to Schwartz's Apple Accounts, Apple IDs, Apple iCloud and Apple iPhones, presumably in an effort to

undermine Schwartz's legal strategy and to gain an unfair advantage in the ongoing litigation.

73.     Despite having put ADP's Counsel on notice of ADPs ongoing access to Schwartz's Apple accounts, Apple IDs Apple iCloud, apple device applications and Apple iPhones, the illegal and unauthorized access has continued up to this filing.

74.     ADP objected to third-party subpoenas to Apple requesting data related to ADP's illegal and unauthorized access to Schwartz's Apple accounts, Apple IDs, Apple iCloud, Apple device applications and Apple iPhones.

75.     ADP, and its employees, began, and have continued to cyberstalk Schwartz's LinkedIn account. *(See attached "Exhibit S")*

76.     Additionally, after Schwartz was terminated by ADP, ADP intentionally withheld Schwartz's Form W-2 from Schwartz, despite numerous email exchanges with Schwartz regarding same.

77.     In furtherance of ADP's retaliatory actions directed towards Schwartz, after ADP terminated Schwartz, ADP intentionally withheld Schwartz's COBRA documents.

78.     Attorneys from McDonald Hopkins, acting as counsel for ADP in the State Court actions, were made aware of the aforementioned criminal activity, as well as breaches of, and weaknesses in, ADP's internal controls based on evidence

and information provided to ADP, and its Counsel at McDonald Hopkins as part of the discovery process in the above-mentioned lawsuits.

79.    Despite having the aforementioned knowledge, ADP continues to operate its business as usual, including continuing its illegal activities as described herein, including repeatedly illegally accessing, and attempting to access Schwartz's Apple Accounts Apple IDs, Apple iCloud, Apple device applications and Apple iPhones, as well as intercepting emails and text messages and other communications, including those between Schwartz and his counsel, by accessing Schwartz's Apple accounts, Apple ID's, Apple iCloud, Apple device applications and Apple iPhones as is evidenced by reports provided to Schwartz by Apple  (*See attached "Composite Exhibit R" Provided to Plaintiff by Apple at Plaintiff's request).*

80.    The IP addresses of 170.146.221.28 and 192.251.51.162 are IP address of ADP servers connected to the world wide web/internet.

81.    The attached reports sent to Schwartz by Apple shows the numerous times ADP's servers, computers and/or devices were, and still are, connected to Schwartz's Apple accounts, Apple IDs, Apple iCloud, Apple device applications and Apple iPhones. The improper connections have continued after Schwartz returned the iPad and laptop computer ADP purportedly issued to Schwartz, which was returned on or about September 7, 2021 (*See attached Composite "Exhibit R" Provided to Plaintiff by Apple at Plaintiff's request).*

82.   The aforementioned connection between ADP and Schwartz's Apple accounts, Apple IDs, Apple iCloud, Apple device applications and Apple iPhones is indicative of either weaknesses in, or intentional breaches of, ADP's internal controls.

83.   Despite counsel for ADP having been put on notice about the connection between ADP and Schwartz's Apple accounts Apple IDs, Apple iCloud, Apple device applications and Apple iPhones, the connection has continued.

84.   Moreover, ADP objected to the issuance of a 3rd party subpoena to Apple which requested that Apple produce, pursuant to subpoena, the same information provided to Schwartz by Apple.  *("Objection to Apple Subpoena"-See attached "Exhibit T")*

85.   ADP has a history of turning a blind eye to breaches of, and weaknesses in its internal controls.

86.   For example, ADP Sales Executive Dean Gross sent several emails that contained personal, non-public information relating to ADP clients to Schwartz's personal email shortly after Schwartz began his employment at ADP. *("Summary of Unencrypted emails"- See attached "Exhibit U")*

87.   Based on information and belief, ADP did not advise these ADP clients that their information had been sent to a personal email, unencrypted, in violation of ADP policy.

88.  Additionally, after Schwartz was terminated, another former ADP employee whose position at ADP involved testing ADP's cybersecurity emailed Schwartz advising that she was terminated when she brought weaknesses and flaws in ADP's cybersecurity to ADP's attention.

89.  The aforementioned allegations relating to ADP's weaknesses in its internal controls show that ADP routinely turns a blind eye to its own "Global Security Policies" outlined in its "ADP Global Security Overview" document that ADP published and made available to investors and clients *(See attached "Exhibit V")*

90.  The former employee stated:

> "I was their Lead Cyber Security Engineer for Cloud Technologies for the Global Security Organization at ADP. I was the only woman on staff of this group, and was the USA representative for this section of our Cyber Security Initiatives. That lasted for about a month. Shortly after being hired I discovered gross negligence on ADPs part by way of many cyber security rules set out for all PCI compliant companys, as well as the NIST, SANS, Gramm-Leach-Bliley Act, and Sarbanes-Oxley compliance. I was initially greeted with excitement for the findings by many of the VPs, until I made it clear that if they did not change or correct the issues I would continue to write my report and send it in officially as a vulnerability report to the CVE databases and the SEC. That's when they decided to intimidate me. My accounts were frozen and I was put on a sort of administrative leave, though it was never officially communicated, this happened October 3rd 2019, the same day a male lead investigator was sent to my home to retrieve my company laptop. The next day October 4th 2019, I emailed them for updates on my status with the firm, and let them know that I felt like there actions were discriminatory in nature, due to the different treatment other employees within the firm had been given despite the similar actions, that unlike mine, were not authorized, where my actions were. Then a separate person from the public, was hired to

follow me home, to my errands and to my doctors appointments the next Monday the 7th, to the point where I had to file a police report for stalking and look into the identity of the stalker to find their connection to ADP, my employer. Then on October 10th, they fired me after I requested via email explanations of why my accounts were frozen, what they were investigating, and letting them know I would be requesting legal counsel or advice."

91.    ADP and its Counsel, McDonald Hopkins, was made aware of this communication in 2019 when it was provided to ADP by Schwartz's former Counsel in 2019.

92.    Schwartz has retained the undersigned law firm and has agreed to pay it reasonable fee for its legal services.

**COUNT I**
**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT ("CFAA")**
**18 U.S.C. § 1030 *et seq.***
**(ADP, INC.)**

93.    Plaintiff incorporates and adopts the allegations contained in paragraphs 1 through 92 as if they were fully set forth herein.

94.    In a nefarious effort to gain advantage and/or counter the truthful allegations made by Schwartz, as stated in the above paragraphs, ADP has intentionally and repeatedly accessed and/or attempted to access Schwartz's business and personal computers/mobile telephone devices, including personal and confidential communications and material stored on these protected computers, as set forth more fully in paragraphs 39, 71, 72, 73, 74, 79, 80 , 83, 84, 85-92 (including without limitation ADP servers, computers and devices

connected to personal accounts, personal Apple iPhone 6s, iPhone 7, iPhone X, Apple IDs, Apple iCloud, Apple devices applications owned and controlled by Schwartz). Specifically, without limitation, the attached _revised_ Composite Exhibit R, which was obtained from Apple based on requests for data by Plaintiff (as evidenced by the emails from Apple included in Composite Exhibit R), and shows specific dates and devices hacked by ADP without authorization.

95.     Additionally, 18 U.S.C. 1030 (e)(1) provides that a protected device "includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

96.     Apple iCloud is accessed through one's Apple account using one's personal Apple ID. (**See Exhibit W-Apple ID and Privacy Document**)

97.     Further, the backups of Schwartz's iPhones show that ADP accessed, and/or continued unauthorized access to Schwartz's iPhones after his termination, as shown in the attached TXT files (**See Exhibit X**)

98.     Separately, ADP required Schwartz to sign a document authorizing ADP to install device applications on his personal mobile device which were to be deleted upon termination. (**See Exhibit Y**)

99.     Defendants did so without Schwartz's authorization and/or by exceeding any authorization ADP was granted in violation of 18 U.S.C. § 1030(a)(4).

100.   As a result of Defendants' unauthorized access, ADP has furthered a scheme to retaliate against Schwartz, violate the attorney-client privilege between

Schwartz and his attorneys, and obtain attorney-client privileged information, which alone is worth in excess of $5000, and Schwartz's personal information and has in fact gained access to same.

101.   ADP's unlawful acts have caused in excess of $5,000 in losses to Schwartz within a year of the filing of this Complaint.

102.   As a result of ADP's unlawful actions, ADP has realized a gain in excess of $5,000 in value since the time of Defendants' unauthorized access, which is within a year of the filing of this Complaint.

103.   The aforementioned repeated unlawful acts by ADP violate 18 U.S.C. § 1030 (Computer Fraud and Abuse Act).

104.   ADP has acted with oppression, fraud, or malice, entitling Schwartz to punitive damages.

**COUNT II**
**VIOLATION OF STORED COMMUNICATIONS ACT ("SCA")**
**18 U.S.C. § 2701 *et seq.***
**(ADP, INC.)**

105.   Plaintiff incorporates and readopts the allegations contained in paragraphs 1 through 92 as if they were fully set forth herein.

106. In a nefarious effort to gain advantage and/or counter the truthful allegations made by Schwartz, as stated in the above paragraphs, ADP has intentionally repeatedly accessed and/or attempted to access Schwartz's Apple iCloud, Apple IDs and Apple device applications, which were used in, or affected

interstate and/or foreign commerce or communication, and which contain electronically stored emails, text messages and other communications, including attorney-client privileged communications, without authorization and/or by exceeding any access ADP was granted.

107.   Schwartz's Apple iCloud, Apple IDs, and Apple device applications are facilities through which electronic communications are provided under 18 U.S.C. § 2701.

108.   ADP obtained unlawful access to Schwartz's electronic communications that were stored on Schwartz's Apple iCloud, Apple IDs, and Apple device applications.

109.   The aforementioned repeated unlawful acts by ADP violate 18 U.S.C. § 2701 (Stored Communications Act).

110.   ADP has acted with oppression, fraud, or malice, entitling Schwartz to punitive damages.

**COUNT III**
**VIOLATION OF WIRETAP ACT**
**18 U.S.C. § 2520 *et seq*.**
**(ADP, INC.)**

111.   Plaintiff incorporates and readopts the allegations contained in paragraphs 1 through 92 as if they were fully set forth herein.

112. In a nefarious effort to gain advantage and/or counter the truthful allegations made by Schwartz, as stated in the above paragraphs, ADP has intentionally, unlawfully intercepted Schwartz's electronic communications, including emails and text messages along with their content by, among other things, repeatedly routing and receiving the content of emails and text messages contemporaneously with its transmission. These include, without limitation, Schwartz's electronic communications to and from Schwartz's personal and business computers including, Schwartz's Apple accounts, Apple IDs, Apple iCloud, and Apple device applications Apple iPhone 6S, iPhone 7, and iPhone X, through ADP's servers. In addition, on information and belief, ADP wrongfully intercepted  Schwartz's Apple accounts, Apple IDs Apple iCloud, Apple device applications and Apple iPhones utilizing ADP software and devices which it used to receive Schwartz's confidential communications contemporaneously with its transmission.

113. ADP knowingly and intentionally accessed Schwartz's Apple accounts and device applications, including Schwartz's Apple accounts and Apple ID's, which allow for transmissions of, among other things, email, to Schwartz's devices.

114. By way of example, in October 2019, ADP filed a Motion in the 2019 Case, and in support, provided a text message purportedly sent on September 28, 2019 by Schwartz to another former ADP employee, Nate Webb ("Webb"). Webb testified during his March 15, 2021 that he (Webb) never shared said text message

with ADP until a few weeks before said deposition.  (**See Exhibit "Z"-Deposition of Nate Webb, page 30**)

115.  ADP's access to Schwartz's Apple iCloud was contemporaneous with the transmission and receipt of emails to and from Schwartz.

116. ADP intercepted communications contemporaneously with their transmission.

117. Schwartz's personal and business computers, Apple accounts, Apple IDs, Apple iCloud, Apple device applications, and Apple iPhones were used in, or affected interstate and/or foreign commerce or communication.

118.  The unlawful actions of ADP violate 18 U.S.C. § 2511 *et. seq.*, (Wiretap Act) and Schwartz is entitled to recover damages for said violation under 18 U.S.C. § 2520.

119.  ADP has acted with oppression, fraud, or malice, entitling Schwartz to punitive damages.

## COUNT IV
## EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 ("ERISA"), AS AMENDED BY THE CONSOLIDATED OMNIBUS BUDGET RECONCILIATIONS ACT OF 1985 ("COBRA"). (ADP, INC.)

120.  Plaintiff incorporates and readopts the allegations contained in paragraphs 1 through 92 as if they were fully set forth herein.

121.  ADP was the sponsor and plan administrator of the Automatic Data Processing, Inc. Flex 2000 Plan ("the Plan") within the meaning of 29 U.S.C. § 1167(1).

122.  Schwartz was a participant in the Plan, and has a colorable claim to benefits under the Plan.  Schwartz is clearly within the zone of interests protected by ERISA.   But for ADP's failure to provide required statutory notices, Schwartz would have received benefits under the Plan, and now has a colorable claim to recover those benefits now.

123.  Among other things, COBRA requires the plan sponsor of each health group plan normally employing more than 20 employees on a typical business day during the preceding year to provide "each qualified beneficiary who would lose coverage under the plan as the result of a qualifying event… to elect, within the selection period, continuation coverage under the plan." 29 U.S.C. § 1161.

124.  Notice is of enormous importance. The COBRA notification requirement exists because employees are not expected to know instinctively of their right to continue their health care coverage.

125.  Additionally, case law makes it clear that notice is not only required to be delivered to the covered employees, but to beneficiaries as well.

126.  COBRA further requires the administrator of such a group health plan to provide notice to any qualified beneficiary of their continuation of coverage rights under COBRA upon the occurrence of a qualifying event. 29 U.S.C. §

1166(a)(4). This notice must be "[i]n accordance with the regulations prescribed by the Secretary" of Labor. 29 U.S.C. § 1166(a).

127.  Schwartz experienced a "qualifying event" as defined by 29 U.S.C. § 1163, and ADP was aware that he had experienced such a qualifying event.

128.  ADP's actions were material and willful.

129.  As result, Schwartz could not make an informed decision about his health insurance and he and his family lost health insurance coverage.

130.  Schwartz and his wife had desperately wanted to have a second child, despite Schwartz's spouse previously having miscarried and despite having lost twins shortly after they were born.

131.  However, as a Schwartz pregnancy would obviously be high risk, by virtue of ADP's refusal to provide COBRA paperwork combined with the fact that the Schwarzes were not eligible to participate in the Affordable Care Act ("ACA"), the Schwartzs were without insurance coverage and forewent the opportunity to have another child and provide their daughter with the sibling they had promised her.

132.  ADP violated ERISA by failing to provide Schwartz, as a participant and beneficiary of the Plan, with adequate notice, as prescribed by COBRA, of his right to continue his health insurance coverage upon the occurrence of a "qualifying event" as defined by the statute.

**COUNT V**
**VIOLATION OF FLORIDA'S SECURITY OF COMMUNICATIONS LAW,**
**FLA. STAT. § 934 *et seq.***
**(ADP, INC.)**

133.   Plaintiff incorporates and readopts the allegations contained in paragraphs 1 through 92 as if they were fully set forth herein.

134.   In a nefarious effort to gain advantage and/or counter the truthful allegations made by Schwartz, as stated in the above paragraphs, ADP has intentionally, unlawfully intercepted Schwartz's electronic communications, including emails and text messages along with their content by, among other things, repeatedly routing and receiving the content of emails and text messages contemporaneously with its transmission.  These include, without limitation, Schwartz's electronic communications to and from Schwartz's personal and business computers including, Schwartz's Apple accounts, Apple IDs, Apple iCloud, and Apple device applications and Apple iPhone 6s, iPhone 7, and iPhone X through ADP's servers. In addition, on information and belief, ADP wrongfully intercepted   Schwartz's Apple accounts, Apple IDs Apple iCloud, Apple device applications and Apple iPhones utilizing ADP software and devices which it used to receive Schwartz's confidential communications contemporaneously with its transmission.

135.   ADP knowingly and intentionally accessed Schwartz's Apple accounts and device applications, including Schwartz's Apple accounts and Apple ID's, which allow for transmissions of, among other things, email, to Schwartz's devices.

136.   By way of example, in October 2019, ADP filed a Motion in the 2019 Case, and in support, provided a text message purportedly sent on September 28, 2019 by Schwartz to another former ADP employee, Nate Webb ("Webb").   Webb testified during his March 15, 2021 that he (Webb) never shared said text message with ADP until a few weeks before said deposition.  (**See Exhibit "Z"-Deposition of Nate Webb, page 30**)

137.   ADP's access to Schwartz's Apple iCloud was contemporaneous with the transmission and receipt of emails to and from Schwartz.

138.  ADP intercepted communications contemporaneously with their transmission.

139.   The unlawful actions of ADP violate Fla. Stat. § 934 *et. seq.*, (Florida's Security of Communications Law) and Schwartz is entitled to recover damages for said violation under Fla. Stat. § 934.10.

140.   ADP has acted with oppression, fraud, or malice, entitling Schwartz to punitive damages.

## COUNT VI
## VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), FLA. STAT. § 501.201 *et seq.* (ADP, INC.)

141.   Plaintiff incorporates and readopts the allegations contained in paragraphs 1 through 92 as if they were fully set forth herein.

142.   The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*, authorizes Schwartz to bring a grievance and/or private cause of action to recover for injury or loss sustained as a result of deceptive and unfair trade practices as prohibited by such Act, and to sue for injunctive relief, where as here, the unfair practices continue unabated.

143.   By virtue of the conduct described above, ADP engaged in unlawful and unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce within the scope of Fla. Stat. § 501.204(1), by, among other things:

   (a) ADP knowingly and intentionally repeatedly accessed and/or attempted to access Schwartz computers, mobile telephone devices, Apple iCloud, Apple IDs, Apple devices and Apple device applications in violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C § 1030 *et seq.*

   (b) ADP knowingly and intentionally repeatedly accessed and/or attempted to access Schwartz computers, mobile telephone devices, Apple iCloud, Apple IDs, Apple devices and Apple device applications in violation of the Stored Communications Act ("SCA"), 18 U.S.C § 2701 *et seq.*

   (c) ADP knowingly and intentionally repeatedly unlawfully intercepted Schwartz's electronic communications by virtue of repeatedly routing Schwartz's electronic communications through ADP's servers in violation of the Wiretap Act, 18 U.S.C § 2511 *et seq.*

   (d) ADP knowingly and intentionally failed to provide Schwartz with proper notice pursuant to Employee Retirement Income Security Act

Of 1974 ("ERISA"), As Amended by The Consolidated Omnibus Budget Reconciliations Act Of 1985 ("COBRA").

(e) ADP knowingly and intentionally failed to provide Schwartz with his IRS Form W-2, despite several notices by Schwartz, and did so in violation of federal law.

(f) ADP knowingly and intentionally repeatedly bypassed or mirrored Schwartz's usernames and/or passwords in violation of the Fraud and Related Activity in Connection with Identification Documents, Authentication Features and Information Statute, 18 U.S.C § 1028 *et seq.*

(g) ADP knowingly and intentionally repeatedly accessed and/or attempted to access Schwartz computers, mobile telephone devices, Apple iCloud, Apple IDs, Apple devices and Apple device applications in violation of Fla. Stat. § 815 *et seq.*

(h) ADP knowingly and intentionally in violation of Fla. Stat. § 934 *et seq.* intercepted, or endeavored to intercept Schwartz's electronic communications.

(i) ADP knowingly and intentionally repeatedly cyberstalked Schwartz's LinkedIn page in violation of Fla. Stat. § 784.048.

144.  To remedy these violations, it is requested that this Court enjoin ADP's continuing conduct in violation of Florida's Deceptive and Unfair Trade Practices Act and award damages for the injuries and losses sustained by Schwartz as a result of such wrongful conduct.

145.  As a direct, natural and proximate result of ADP's conduct and violation of the Florida Deceptive and Unfair Trade Practices Act, Schwartz has suffered actual damages including invasion of personal and professional privacy, loss of use and devaluation, including costs to replace, electronic devices tampered by ADP, and increased attorney's fees in enforcing his rights. Schwartz seeks recovery of his costs and attorney's fees in pursuing this action.

**COUNT VII**
**VIOLATION OF COMPUTER FRAUD AND ABUSE ACT ("CFAA")**
**18 U.S.C. § 1030 *et seq.***
**(AUTOMATIC DATA PROCESSING, INC.)**

146.   Plaintiff incorporates and adopts the allegations contained in paragraphs 1 through 92 as if they were fully set forth herein.

147.   In a nefarious effort to gain advantage and/or counter the truthful allegations made by Schwartz, as stated in the above paragraphs, ADP has intentionally and repeatedly accessed and/or attempted to access Schwartz's business and personal computers/mobile telephone devices, including personal and confidential communications and material stored on these protected computers, as set forth more fully in paragraphs 39, 71, 72, 73, 74, 79, 80, 83, 84, 85-92, including without limitation ADP servers, computers and devices connected to personal accounts, Apple iPhone 6s, Apple iPhone 7, iPhone X, computers and devices, Apple accounts, Apple IDs, Apple iCloud and other device applications, and computers and devices owned and controlled solely by Schwartz.  Specifically, without limitation, the attached *revised* Composite Exhibit R which was obtained from Apple based on requests for data by Schwartz (as evidenced by the emails from Apple included in Composite Exhibit R), and shows specific dates and devices hacked by ADP without authorization.

148. Additionally, 18 U.S.C. 1030 (e)(1) provides that a protected device "includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

149. Apple iCloud is accessed through one's Apple account using one's personal Apple ID. (**See Exhibit W-Apple ID and Privacy Document**)

150. Further, the backups of Schwartz's iPhones show that ADP accessed, and/or continued unauthorized access to Schwartz's iPhones after his termination, as shown in the attached TXT files (**See Exhibit X**)

151. Separately, ADP required Schwartz to sign a document authorizing ADP to install device applications on his personal mobile device which were to be deleted upon termination. (**See Exhibit Y**)

152. Defendants did so without Schwartz's authorization and/or by exceeding any authorization ADP was granted in violation of 18 U.S.C. § 1030(a)(4).

153. As a result of Defendants' unauthorized access, ADP has furthered a scheme to retaliate against Schwartz, violate the attorney-client privilege between Schwartz and his attorneys, attorney-client privileged information, which alone is worth in excess of $5000, and obtain Schwartz's personal information and has in fact gained access to same.

154.  ADP's unlawful acts have caused in excess of $5,000 in losses to Schwartz within a year of the filing of this Complaint.

155.  As a result of ADP's unlawful actions, ADP has realized a gain in excess of $5,000 in value since the time of Defendants' unauthorized access, which is within a year of the filing of this Complaint.

156.  The aforementioned repeated unlawful acts by ADP violate 18 U.S.C. § 1030 (Computer Fraud and Abuse Act).

157.  ADP has acted with oppression, fraud, or malice, entitling Schwartz to punitive damages.

**COUNT VIII**
**VIOLATION OF STORED COMMUNICATIONS ACT ("SCA")**
**18 U.S.C. § 2701 *et seq.***
**(AUTOMATIC DATA PROCESSING, INC.)**

158.  Plaintiff incorporates and readopts the allegations contained in paragraphs 1 through 92 as if they were fully set forth herein.

159. In a nefarious effort to gain advantage and/or counter the truthful allegations made by Schwartz, as stated in the above paragraphs, ADP has intentionally repeatedly accessed and/or attempted to access Schwartz's Apple iCloud, Apple IDs and Apple device applications, which were used in, or affected interstate and/or foreign commerce or communication, and which contain electronically stored emails, text messages and other communications, including

attorney-client privileged communications, without authorization and/or by exceeding any access ADP was granted.

160. Schwartz's Apple iCloud, Apple IDs, and Apple device applications are facilities through which electronic communications are provided under 18 U.S.C. § 2701.

161. ADP obtained unlawful access to Schwartz's electronic communications that were stored on Schwartz's Apple iCloud, Apple IDs, and Apple device applications.

162. The aforementioned repeated unlawful acts by ADP violate 18 U.S.C. § 2701 (Stored Communications Act).

163. ADP has acted with oppression, fraud, or malice, entitling Schwartz to punitive damages.

## COUNT IX
## VIOLATION OF WIRETAP ACT
## 18 U.S.C. § 2520 *et seq.*
## (AUTOMATIC DATA PROCESSING, INC.)

164. Plaintiff incorporates and readopts the allegations contained in paragraphs 1 through 92 as if they were fully set forth herein.

165. In a nefarious effort to gain advantage and/or counter the truthful allegations made by Schwartz, as stated in the above paragraphs, ADP has intentionally, unlawfully intercepted Schwartz's electronic communications,

including emails and text messages along with their content by, among other things, repeatedly routing and receiving the content of emails and text messages contemporaneously with its transmission.  These include, without limitation, Schwartz's electronic communications to and from Schwartz's personal and business computers including, Schwartz's Apple accounts, Apple IDs, Apple iCloud, and Apple device applications and Apple iPhone 6s, iPhone 7 and iPhone X through ADP's servers. In addition, on information and belief, ADP wrongfully intercepted   Schwartz's Apple accounts, Apple IDs Apple iCloud, Apple device applications and Apple iPhones utilizing ADP software and devices which it used to receive Schwartz's confidential communications contemporaneously with its transmission.

166.   ADP knowingly and intentionally accessed Schwartz's Apple accounts and device applications, including Schwartz's Apple accounts and Apple ID's, which allow for transmissions of, among other things, email, to Schwartz's devices.

167.   By way of example, in October 2019, ADP filed a Motion in the 2019 Case, and in support, provided a text message purportedly sent on September 28, 2019 by Schwartz to another former ADP employee, Nate Webb ("Webb").  Webb testified during his March 15, 2021 that he (Webb) never shared said text message with ADP until a few weeks before said deposition.  (**See Exhibit "Z"-Deposition of Nate Webb, page 30**)

168.   ADP's access to Schwartz's Apple iCloud was contemporaneous with the transmission and receipt of emails to and from Schwartz.

169.   ADP intercepted communications contemporaneously with their transmission.

170.   Schwartz's personal and business computers, Apple accounts, Apple IDs, Apple iCloud, Apple device applications and Apple iPhones were used in, or affected interstate and/or foreign commerce or communication.

171.   The unlawful actions of ADP violate 18 U.S.C. § 2511 *et. seq.*, (Wiretap Act) and Schwartz is entitled to recover damages for said violation under 18 U.S.C. § 2520.

172.   ADP has acted with oppression, fraud, or malice, entitling Schwartz to punitive damages.


<u>**COUNT X**</u>
<u>**EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 ("ERISA"),**</u>
<u>**AS AMENDED BY THE CONSOLIDATED OMNIBUS BUDGET**</u>
<u>**RECONCILIATIONS ACT OF 1985 ("COBRA").**</u>
<u>**(AUTOMATIC DATA PROCESSING, INC.)**</u>

173.   Plaintiff incorporates and readopts the allegations contained in paragraphs 1 through 92 as if they were fully set forth herein.

174.   ADP was the sponsor and plan administrator of the Automatic Data Processing, Inc. Flex 2000 Plan ("the Plan") within the meaning of 29 U.S.C. § 1167(1).

175.   Schwartz was a participant in the Plan, and has a colorable claim to benefits under the Plan.  He is clearly within the zone of interests ERISA was intended to protect. But for ADP's failure to provide required statutory notices, Schwartz would have received benefits under the Plan, and he now has a colorable claim to recover those benefits now.

176.   Among other things, COBRA requires the plan sponsor of each health group plan normally employing more than 20 employees on a typical business day during the preceding year to provide "each qualified beneficiary who would lose coverage under the plan as the result of a qualifying event… to elect, within the selection period, continuation coverage under the plan." 29 U.S.C. § 1161.

177.   Notice is of enormous importance. The COBRA notification requirement exists because employees are not expected to know instinctively of their right to continue their health care coverage.

178.   Additionally, case law makes it clear that notice is not only required to be delivered to the covered employees, but to beneficiaries as well.

179.   COBRA further requires the administrator of such a group health plan to provide notice to any qualified beneficiary of their continuation of coverage rights under COBRA upon the occurrence of a qualifying event. 29 U.S.C. § 1166(a)(4). This notice must be "[i]n accordance with the regulations prescribed by the Secretary" of Labor. 29 U.S.C. § 1166(a).

180.   Schwartz experienced a "qualifying event" as defined by 29 U.S.C. § 1163, and ADP was aware that he had experienced such a qualifying event.

181.   ADP's actions were material and willful.

182.   As result, Schwartz could not make an informed decision about his health insurance and he and his family lost health insurance coverage.

183.   Schwartz and his wife had desperately wanted to have a second child, despite Schwartz's spouse previously having miscarried and despite having lost twins shortly after they were born.

184.   However, as a Schwartz pregnancy would obviously be high risk, by virtue of ADP's refusal to provide COBRA paperwork combined with the fact that the Schwartzs were not eligible to participate in the Affordable Care Act ("ACA"), the Schwartzs were without insurance coverage and forewent the opportunity to have another child and provide their daughter with the sibling they had promised her.

185.   ADP violated ERISA by failing to provide Schwartz, as a participant and beneficiary of the Plan, with adequate notice, as prescribed by COBRA, of his right to continue his health insurance coverage upon the occurrence of a "qualifying event" as defined by the statute.

**COUNT XI**
**VIOLATION OF FLORIDA'S SECURITY OF COMMUNICATIONS LAW,**
**FLA. STAT. § 934 *et seq*.**
**(AUTOMATIC DATA PROCESSING, INC.)**

186.   Plaintiff incorporates and readopts the allegations contained in paragraphs 1 through 92 as if they were fully set forth herein.

187.   In a nefarious effort to gain advantage and/or counter the truthful allegations made by Schwartz, as stated in the above paragraphs, ADP has intentionally unlawfully intercepted Schwartz's electronic communications, including emails and text messages along with their content by, among other things, repeatedly routing and receiving the content of emails and text messages contemporaneously with its transmission.   These include, without limitation, Schwartz's electronic communications to and from Schwartz's personal and business computers including, Schwartz's Apple accounts, Apple IDs, Apple iCloud, and Apple device applications and Apple iPhone 6s, iPhone 7, and iPhone X through ADP's servers. In addition, on information and belief, ADP wrongfully intercepted   Schwartz's Apple accounts, Apple IDs Apple iCloud, Apple device applications and Apple iPhones utilizing ADP software and devices which it used to receive Schwartz's confidential communications contemporaneously with its transmission.

188.   ADP knowingly and intentionally accessed Schwartz's Apple accounts and device applications, including Schwartz's Apple accounts and Apple ID's, which allow for transmissions of, among other things, email, to Schwartz's devices.

189.    By way of example, in October 2019, ADP filed a Motion in the 2019 Case, and in support, provided a text message purportedly sent on September 28, 2019 by Schwartz to another former ADP employee, Nate Webb ("Webb").   Webb testified during his March 15, 2021 that he (Webb) never shared said text message with ADP until a few weeks before said deposition.  (**See Exhibit "Z"-Deposition of Nate Webb, page 30**)

190.    ADP's access to Schwartz's Apple iCloud was contemporaneous with the transmission and receipt of emails to and from Schwartz.

191.    ADP intercepted communications contemporaneously with their transmission.

192.    The unlawful actions of ADP violate Fla. Stat. § 934 *et. seq*., (Florida's Security of Communications Law) and Schwartz is entitled to recover damages for said violation under Fla. Stat. § 934.10.

193.    ADP has acted with oppression, fraud, or malice, entitling Schwartz to punitive damages.

## COUNT XII
## VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA"), FLA. STAT. § 501.201 *et seq*. (AUTOMATIC DATA PROCESSING, INC.)

194.    Plaintiff incorporates and readopts the allegations contained in paragraphs 1 through 92 as if they were fully set forth herein.

195.  The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*, authorizes Schwartz to bring a grievance and/or private cause of action to recover for injury or loss sustained as a result of deceptive and unfair trade practices as prohibited by such Act, and to enjoin continuing action in violation of the Act.

196.  By virtue of the conduct described above, ADP engaged in unlawful and unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce within the scope of Fla. Stat. § 501.204(1), by, among other things:

(a) ADP knowingly and intentionally repeatedly accessed and/or attempted to access Schwartz computers, mobile telephone devices, Apple iCloud, Apple IDs, Apple devices and Apple device applications in violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C § 1030 *et seq.*

(b) ADP knowingly and intentionally repeatedly accessed and/or attempted to access Schwartz computers, mobile telephone devices, Apple iCloud, Apple IDs, Apple devices and Apple device applications in violation of the Stored Communications Act ("SCA"), 18 U.S.C § 2701 *et seq.*

(c) ADP knowingly and intentionally repeatedly unlawfully intercepted Schwartz's electronic communications by virtue of repeatedly routing Schwartz's electronic communications through ADP's servers in violation of the Wiretap Act, 18 U.S.C § 2511 *et seq.*

(d) ADP knowingly and intentionally failed to provide Schwartz with proper notice pursuant to Employee Retirement Income Security Act Of 1974 ("ERISA"), As Amended by The Consolidated Omnibus Budget Reconciliations Act Of 1985 ("COBRA").

(e) ADP knowingly and intentionally failed to provide Schwartz with his IRS Form W-2, despite several notices by Schwartz, and did so in violation of federal law.

(f) ADP knowingly and intentionally repeatedly bypassed or mirrored Schwartz's usernames and/or passwords in violation of the Fraud and

Related Activity in Connection with Identification Documents, Authentication Features and Information Statute, 18 U.S.C § 1028 *et seq.*

(g) ADP knowingly and intentionally repeatedly accessed and/or attempted to access Schwartz computers, mobile telephone devices, Apple iCloud, Apple IDs, Apple devices and Apple device applications in violation of Fla. Stat. § 815 *et seq.*

(h) ADP knowingly and intentionally in violation of Fla. Stat. § 934 *et seq.* intercepted, or endeavored to intercept Schwartz's electronic communications.

(i) ADP knowingly and intentionally repeatedly cyberstalked Schwartz's LinkedIn page in violation of Fla. Stat. § 784.048.

197.    To remedy these violations, it is requested that this Court enjoin ADP from continuing its actions in violation of the act and award damages for the injuries and losses sustained by Schwartz as a result of ADP's unlawful, deceptive and unfair trade practices.

198. As a direct, natural and proximate result of ADP'S conduct and violation of the Florida Deceptive and Unfair Trade Practices Act, Schwartz has suffered actual damages including invasion of personal and professional privacy, loss of use and devaluation, including costs to replace, electronic devices tampered by ADP, and increased attorney's fees in enforcing his rights. Schwartz seeks recovery of his costs and attorney's fees in pursuing this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, prays for relief as follows:

(a) Awarding appropriate equitable relief, including but not limited to, an order enjoining Defendants from accessing and intercepting

communications from or relating to Schwartz's personal and business computers, Schwartz's Apple IDs, Apple Accounts, Apple iCloud, Apple devices and Apple device applications;

(b) Awarding damages, including, but not limited to, compensatory and punitive damages to Schwartz for violations of 18 U.S.C. 1020 *et seq.*, 18 U.S.C. 2701 *et seq.*, violations of 18 U.S.C. 2511 *et. seq.*, pursuant to 18 U.S.C. 2520, violations of Fla. Stat. § 934 *et seq.*, and violations of Fla. Stat. 501.201 *et seq.*;

(c) Awarding statutory penalties to Schwartz pursuant to 29 U.S.C. § 1132(c)(1) and 29 C.F.R. § 2575.502c-1 in the amount of $110 per day;

(d) Awarding attorneys' fees, costs and expenses to Plaintiff's counsel as provided by applicable law; and

(e) Granting such other and further relief, in law or equity, as this Court deems appropriate.

## VI.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,
**PARRISH & GOODMAN, PLLC**
*/s/ Robert H. Goodman*
ROBERT H. GOODMAN
Florida Bar No.:  1008059
13031 McGregor Blvd., Suite 8

Fort Myers, Florida 33919
Phone: (813) 643-4529
Facsimile: (813) 315-6535
Primary:
rgoodman@parrishgoodman.com
Secondary:
admin@parrishgoodman.com
AND
JOSEPH E. PARRISH
Florida Bar. No: 690058
Primary:
jparrish@parrishgoodman.com
Secondary:
admin@parrishgoodman.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served via the Clerk of the Court's CM/ECF filing system.  I further certify that the foregoing document will be mailed by first class mail, postage prepaid, to any parties that do not participate in the CM/ECF filing system, on this 5th day of October, 2021.


*/s/ Robert H. Goodman*
Attorney

## VERIFICATION

**I understand that I am swearing or affirming under oath to the truthfulness of the claims made in this Verified Complaint and that the punishment for knowingly making a false statement includes fines and/or imprisonment.**

Dated: _10/5/21_____

_[signature]_____

DAVID SCHWARTZ,
Plaintiff

STATE OF FLORIDA }

                                }

COUNTY OF LEE              }

Subscribed and sworn or affirmed to before me on this___5___ day of October, 2021, by DAVID SCHWARTZ, who is personally known to me and/or produced a driver's license.
as identification.

_[signature]_____ _____

Notary Public

(Stamp)

DORYS J MARTINEZ
State of Florida-Notary Public
Commission # GG 201362
My Commission Expires
March 28, 2022